v. José Álvaro Santiago Ms. Bonilla Good morning, Your Honors. Madam Clerk, Victoria Bonilla on behalf of José Álvaro Santiago. May it please the Court. This case is about a Rule 11 violation. It's a requirement in his plea colloquy of what are the consequences of maximum penalties, also minimum penalties. So the government has conceded the first two prongs of plain error. So the case before us really is about the third and fourth prongs. I will address that, Your Honor. Mr. Santiago's substantial rights have been affected by the Court's failure to inform Mr. Santiago of the severe consequences of a minimum mandatory penalty. Here, this consecutive minimum sentence was automatic, it was going to be definite, and it was a direct consequence of his plea. The Court's failure to advise Mr. Santiago of that fact is very, very substantial. The government suggests that he was informed of that fact, both by his admission that he and his counsel had thoroughly discussed the sentencing range, that it was put forth in the pre-sentence report to which there was no objection, that I think post-objection and it continues in the pre-sentence report, the judge, after the sentencing, there's no exclamation of, oh, I didn't understand that, Your Honor. The record suggests even if the judge did not and the prosecutor did not properly articulate the matter, he knew anyway. And beyond that, one of the alternatives to his guilty plea was a prosecution for the death penalty. Therefore, it's extremely unlikely that he can show the type of prejudice that would be needed. I disagree with all due respect, Your Honor, and I would suggest to the Court that the case of Ortiz-Garcia, 665 F. 3rd 279 from this circuit, from 2011, is very similar to Mr. Santiago's situation. In that case, it was maximum penalties. In Mr. Santiago's situation, it's minimum penalties. The difference of not advising in that particular case was no different than in this case. And in that case, the circuit court advised that the rule during a plea colloquy and as well as during sentencing that in the PSR, let's address the PSR portion of it. In the PSR, it's correct, it is in the PSR, it is advised, but there is nothing in this record that says that Mr. Santiago was advised of the contents of the PSR. During the plea, there is a minor, not the plea, the sentencing, there is two or three sentences at the beginning where the court merely asked counsel if he has spoken. Rule 32. Well, I thought the record said he was asked whether he reviewed the PSR with his counsel, with his client. And he says yes, he has. The answer is yes. But I thought that in Ortiz, what they said is that there was no evidence in the record that counsel had reviewed the PSR with the client. And it might be a different case if he had reviewed it. I believe it's in Ortiz, it says that the defendant was not, the court, it talks about Rule 32. And it says that the defendant as well as the counsel for the defendant need to be asked. So is that, is the contention here that there is a separate Rule 11 violation because there was no request that the, there was no determination by the judge that the defendant had read the PSR? It's a violation of Rule 32. Rule 32 I1A, Your Honor. And it was raised by counsel. But you're not bringing that as an appeal here. Well, I'm raising it during argument. That's not one of the violations. It's a violation, not of the Rule 11. It's a violation of Rule 32, where the court has got to inquire both of the defendant and counsel. And in this case, like in Ortiz-Garcia, the defendant was not asked. He was not inquired of. Merely, we took counsel's word and we kept on moving. So let's see if we accept that, that this is like Ortiz in the sense we don't know from the record whether the defendant actually read the PSR. All we know is that the counsel, unlike in Ortiz, said that he reviewed it with his client. That there then were a series of detailed objections to the PSR, not including this one from counsel. Taking all that as true, is your client, I just couldn't tell if you agree, is your client's position that he would withdraw the plea? That's my understanding, and that's why. It doesn't say that, you never say that directly in the brief. Am I reading that wrong? I do not say it directly, but if you actually look at everything, all these letters, all of the client's submissions to the court. Every single one of them is complaining about counsel, his lack of knowledge, even to two weeks prior to trial. So just one last on this, what are we to make at the sentencing hearing when after the judge has informed him publicly of the 10-year consecutive minimum sentence, your client speaks at the hearing and says, whatever sentence you give me, I'm ready to accept. That's after he's just heard this point. It's sort of an unusual statement. So we don't have that in every case, and we're trying to figure out would they actually be affected by the sentence, given that here the sentence is within the range that he said many, many times, is the range he expected. And then we have him on the record after hearing about the minimum, specifically saying, any sentence you give, I would accept. The client's, Mr. Santiago's submission to the court, two or three weeks prior to trial, says that he has no knowledge, he's not being able to communicate with his counsel. And in that submission he says, if convicted, I will get 30 to 40 years. If convicted, and we have to read it in the context of that letter, which it is about failure to communicate, not advising, not providing me information, not giving me things in writing like I've requested. It's a letter complaining about his counsel just two or three weeks before he's supposed to start empaneling a jury. And in that letter he says, if convicted. When we read the letter as a whole, what that means is that at trial, because the letter is talking about trial. The letter's not talking about a plea. The next thing we know, he is two or three weeks later in the process of a jury to start a trial, and he pleads. And he pleads, and during that plea, there are certain aspects, if you read those transcripts carefully, that he can't hear well. And I think that's, the court has to take some time. Wait, but that all just shows, at the time of the plea, maybe there is some, the point that you're making. I guess the question is, okay, but had he known this fact then, given all that we know from the case, given what he said at sentencing, given the evidence against him, given what the range would have been anyway, given all that other evidence, is there a reason to think that it is more probable than not that now, had he been apprised of it, he would have withdrawn the plea and taken the risk of what could be a much longer sentence if he's resentenced? Yes, he could. He could well have. To me, it's clear from that record of all of the client's submission that he had very little knowledge of what was going on, right up to the moment when he pled. How old was he at the time of the plea? Early 30s. I do not know the exact... So the 40-year sentence... He'd be in his 70s. He'd be in his 70s, which is still better than the death penalty. Well, the government had decided not to prosecute as a death penalty case, and that was taken off the table very early on, very early on in the proceedings. Two years before any of this plea occurred. Any further questions? No. Thank you. Good morning. Donald Lockhart for the government. So even before pleading guilty, the defendant sends a letter from prison in which he states, I'm facing a life sentence if I am found guilty at trial and 40 years if I plead guilty. Now, in the reply brief, there was a suggestion. How do we know that this was Mr. Santiago sending the letter? Because the letter is signed HOHO. The answer is that right in the district court's severance ruling, which that was part of, the judge found that this was a letter from Santiago. That ruling is in the government's addendum, pages 8 through 9. If you look at that, you'll see there is a judicial finding that Santiago was the author of the letter, and it's clear that that's who was the person sending it if you look at the content of the letter. Now, what's the significance of him saying 40 years if I plead guilty? If you look at the pre-sentence report, you see the sentencing guideline calculations are very straightforward. They only involve a couple steps. The defendant's base offense level is 43. He gets two points off for acceptance of responsibility. That takes him down to 41. His criminal history category is 6. That yields a guideline sentencing range of 360 months to life in prison, and when you add the 10-year mandatory minimum, that brings you up to 480 months or 40 years to life. So when the defendant, even prior to pleading guilty, is talking about 40 years, what he's talking about is his low end of the guideline sentencing range that he's going to be facing, and the 10-year mandatory minimum is, in essence, baked into that 40-year number. What's the evidence that anybody went through a calculation like that before the naked plea with him? Because right at the plea, the defense attorney confirms with the court that he's gone over the sentencing guideline calculations with his client and the likely range that he's going to face. And when you put that in combination with how simple this particular calculation is, how few steps are involved, and the defendant's own reference to 40, which is the bottom of the guideline sentencing range, you see quite clearly that he understood well before pleading guilty the basic architecture of the sentence. Now, most defendants are concerned, obviously, with what net sentence they're facing. They don't care quite as much about the constituent pieces that get them to that net sentence. But assuming, for the sake of argument, that this defendant was interested in those little constituent parts, he got them all in the initial PSR, the final PSR, and at sentencing, and at none of those stages did he complain or say, I didn't know that there was an embedded 10-year mandatory minimum that went into the 40-year bottom of the guidelines range that I'm facing. He never once said boo about that. And unlike Ortiz-Garcia, the record does establish that the defense attorney reviewed and discussed that PSR with the client. Now, the reply brief, I thought, was trying to make a distinction between read and review. That was what I thought the point of the reply brief was. The judge here confirmed that the defense attorney reviewed the PSR with his client, not that he read it with the client. That's what I thought the defense claim was in the reply brief. From our standpoint, those two words are more or less synonymous in this context. And if anything, review is a stronger word, because what it implies is that the defense attorney is actually going, sitting down with the client and going through the PSR in some detail. But it doesn't necessarily mean that. I mean, it is true in Ortiz, they use both formulations. It says that he reviewed it, but then it concludes that little passage by saying, the question is whether he reviewed it, and then it says there's no evidence in the record that the defendant had read it, which maybe is a reference to Rule 32. I'm not sure why they all of a sudden shift over to read rather than review. Yeah, it seems to be referring to Rule 32 when the court says that. Our point about that is that that sort of nuance can't possibly spell the difference between affirmance and reversal, at least in a case where, unlike Ortiz-Garcia, we have the pre-plea statements that we're relying on. It's not just that we're relying on the statements in the PSR, which was the argument in Ortiz-Garcia, we have the three separate pre-plea statements of the defendant, which we're also relying on, and at least in combination, and when you consider the strength of the evidence, that case, this case, is meaningfully distinguishable in many respects from Ortiz-Garcia. Assume for a second that he was not interested in the constituent parts, or that we can't conclude that. At the change of plea, at the Rule 11, he was informed of the potential for a life sentence? Yes. So realistically, or what would realistically the thought process be in terms of whether that was a realistic possibility at that point? Well, we know he thought it was a realistic possibility, because in the letter from prison, that's if he goes to trial. If I go to trial, I'll get life. If I plead guilty, I'll get 40 years. So what I'm saying is he's informed at the change of plea that there's a potential still for life imprisonment. So how realistic is that? Well, he's not the actual shooter in the case, so he has to be thinking, maybe I'll get less than life, but there could be any sort of range of sentences between 40 and life. How realistic would it be for him to think that he's going to get less than what he was sentenced on on the third count? Less than 40, not much, because 40 is the bottom of the guideline sentencing range. He has a horrific record. He's deeply involved in the commission of the crime. The shooter has already been sentenced to life in prison, narrowly escaped a death penalty situation. And so from his perspective, if I'm the defense attorney advising him, I have to tell him, look, realistically, the best you can hope for is 40. Now we can try to get the court to downwardly vary from 40, because that's what it would be, a downward variance. But your facts don't really give us much hope. Is that because of the mandatory minimum being added on consecutively, that you would give that advice? No, it's because of the total guideline sentencing range. So if we started at a 360 to life range, you would say that the expectation would be that he would get 40? He couldn't expect less than that? No. What I'm saying is you can't separate the 10-year mandatory minimum from the guideline range. But that's his point, isn't it? I mean, that's why he's concerned about the rule of thumb. What he's concerned is the overall number, not why you get to the number. In other words, he knows that he's facing a 40-year bottom of the guideline sentence. It just so happens that one ingredient of that is the 10-year mandatory minimum. From his perspective, he's going to have to convince the sentencing judge to vary below 40. And that's going to be a top priority. How would you advise how hard that would be if the 40 is a consequence of a 10-year minimum being tacked on consecutively versus just a range in which you could depart from it? I guess that's the key point, right? I mean, now you're entering the realm of speculation. And the problem here is that it's his burden, not ours, to show a reasonable probability that but for the failure to mention this mandatory minimum at the plea colloquy, there's a reasonable probability that he would have gone to trial on all three counts. And we think you have to look at this in terms of the entire package. It's his statements prior to the plea. It's the statements in the PSR. And one other factor, which we haven't even mentioned yet, which is that in most of the cases relied upon by the defense, there is an affirmative misstatement to the defendant about the statutory penalties he's facing, which is significant. In a case where the defendant has been told incorrectly in the plea agreement and at the plea hearing, which is what most of these cases involve, what the statutory penalty is, that defendant may have a little bit of a leg up in showing a reasonable probability that that could have affected his decision. But in a case where the plea hearing is merely silent on the statutory penalty in question, it seems much more difficult to make that showing, particularly on the facts that we've given the court. So unless there are further questions, we'll rest on the brief. Thank you. Thank you.